DOCKETED

SEP 3 2004

FILED FOR DOCKETING

04 SEP -2 PM 1:39

CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SONIC NETWORK, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| MOTOROLA, INC., | ) |
| | ) |
| Defendant. | ) |

040 5771

JUDGE CASTILLO

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## NOTICE OF FILING

TO:   F. Dean Armstrong, Esq.
      1324 Dartmouth Road
      Flossmoor, Illinois 60422

PLEASE TAKE NOTICE that on September 2, 2004, we filed with the United States

District Court Northern District of Illinois, Motorola, Inc.'s Notice of Removal, a copy of which

is attached and hereby served upon you.

MOTOROLA, INC.

By: _____
        One of Its Attorneys

Bart A. Lazar
Jennifer K. Fardy
Daniel W. Tarpey
Seyfarth Shaw LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000
Attorney No. 90747

CHI 10782627.1

ED-7
FILED FOR DOCKETING

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

CLERK
U.S. DISTRICT COURT

SONIC NETWORK, INC.,

        Plaintiff,

        v.

MOTOROLA, INC.,

        Defendant.

Civil Action No. 04C 5771

JUDGE

MAGISTRATE
GERALDINE

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1444 and 1446, Defendant Motorola, Inc. hereby removes to this Court the above-captioned action, which is presently pending in the Circuit Court of Cook County, Illinois.

Removal of this action is proper for the following reasons:

1.     On June 24, 2004, Plaintiff Sonic Network, Inc. commenced this action against Motorola, Inc. in the Circuit Court of Cook County, Illinois, County Department, Law Division. Plaintiff's Complaint contains three counts. Count I alleges breach of contract. Count II alleges misappropriation and conversion of "intellectual property and trade secrets." Count III seeks an injunction. A true and correct copy of the Complaint is attached hereto and marked as Exhibit A.

2.     Removal is proper if the district court to which the Defendant seeks removal has subject matter jurisdiction. 28 U.S.C. § 1441(a); *see also Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 986 F.2d 476, 477 (Fed. Cir. 1993).

3.     It is clear that the district courts have "original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety

protection and copyright cases." 28 U.S.C. § 1338(a). Indeed, the district courts have exclusive subject matter jurisdiction over "causes of action created by federal patent law and causes of action whose resolution depends on a substantial question of federal patent law." *Additive Controls*, 986 F.2d at 478 (holding that the plaintiff's right to relief depended upon resolution of a substantial question of federal patent law); *see also U.S. Valves, Inc. v. Dray*, 212 F.2d 1368, 1372 (Fed. Circ. 2000) (holding that patent law was a necessary element of the plaintiff's breach of contract claim because resolution of a breach of contract claim required a showing of whether the defendant sold valves which were covered by the licensed patents). Claims for relief which "arise under federal patent law include 'patent invalidity, *infringement*, and patent-antitrust.'" *Sheridan v. Flynn*, 2003 WL 22282378, *4 (citations omitted; emphasis added). Claims for relief which arise under federal copyright law include the reproduction of a copyrighted work, preparing derivative works based on a copyrighted work and the distribution of copies of the copyrighted work to the public. 17 U.S.C. §§ 301, 106(1)-(3).

    4.    Count II of the Complaint entitled "Conversion" alleges "misappropriation and conversion of Plaintiff's intellectual property and trade secrets." (Ex. A, ¶ 29). Based on the general allegation of misappropriation and conversion of "intellectual property," which is not otherwise defined or clarified in the Complaint, it appears that (since trade secrets are separately specified in the Complaint) the Plaintiff is attempting to plead a cause of action for misappropriation of patents or copyrights as a result of Motorola's continued use of the "proprietary ringtone technology" developed by Sonic, either alone, or together with Motorola and incorporating those materials into Motorola's communication devices (Ex. A., ¶¶ 23-24). The District Court has original jurisdiction over these actions. *See* 28 U.S.C. § 1338(a). Moreover, to the extent that Count II attempts to state a claim for misappropriation, or

2

infringement, of patents or copyrights, it is clear that resolution of such issues falls within the *exclusive* jurisdiction of the District Court. *See* 28 U.S.C. § 1338(a); *Additive Controls,* 986 F.2d at 478; *U.S. Valves,* 212 F.2d at 1372.

5.     Jurisdiction exists in a removal action if the case might have been brought in federal court in the first place. *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir. 1993). Because Count II alleges misappropriation of "intellectual property," which must refer to patents, copyrights or trademarks, it appears that this is a civil action which not only might have been brought in the District Court, but, to the extent the Complaint intends to plead a claim for copyright or patent infringement, the Complaint must be brought in the District Court as it has original jurisdiction pursuant to 28 U.S.C. § 1331.  Therefore, the Complaint may be removed pursuant to 28 U.S.C. § 1441 (a) and (c).

6.     Moreover, "[r]emoval is proper where the real nature of the claim asserted in the complaint is federal, whether or not so characterized by the plaintiff." *Jones v. General Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976).  A "plaintiff may not deny a defendant his right to a federal forum by artfully disguising an essentially federal law claim in terms of state law." *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249 (7th Cir. 1981).  Here, Count II of the Complaint purports to allege a state law cause of action for conversion, but upon review of the substance of the allegations in Count II, it is clear that it actually asserts a federal claim for misappropriation of Sonic's proprietary ringtone technology, comprised of alleged trade secrets, as well as copyright and/or patent rights.   Of course, a "plaintiff who has both federal and state causes of action may choose to ignore the federal claims and pursue only the state claims in the state court." *People of the State of Illinois v. Kerr-McGee Chemical Corp.*, 677 F.2d 571, 575 (7th Cir. 1982).  However, to defeat removal in such circumstances, a plaintiff must "avoid[]

3

allegations which provide a basis for the assertion of federal jurisdiction." *Jones*, 541 F.2d at 664. Consequently, as the Complaint is drafted, Count II appears to set forth a federal cause of action. To defeat removal, the Plaintiff would have to affirmatively annul or "avoid" its claim for misappropriation of intellectual property other than trade secrets and trademarks. *See Id.*

7. This case is distinguishable from *Verotix Systems, Inc. v. Follett Library Resources*, 235 F. Supp. 2d 851 (N.D. Il. 2002), in which the District Court found that the Complaint was "meticulously" drafted to plead only state law causes of action and was not "artfully pled" to disguise a federal court claim as a state law claim to avoid federal court jurisdiction. *Id.* at 582. There, the Court determined that nothing in the Complaint itself appeared to allege a federal claim. *Id.* Conversely, the instant Complaint was not meticulously crafted in a manner which successfully avoids federal jurisdiction. Simply labeling Count II as a claim for "conversion" does not, in and of itself, make it a state law claim when the substance of the allegations appear to attempt to state a claim for a federal claim of copyright or patent infringement. Plaintiff cannot avoid federal court jurisdiction by merely failing to call the allegations what they are: copyright and/or patent infringement claims.

8. Removal is timely because Motorola filed its Notice of Removal within 30 days of being served with a copy of the Complaint and Summons on August 5, 2004.

9. This Notice of Removal promptly will be served upon the counsel of record for Sonic and will also be filed with the Clerk of the Circuit Court of Cook County, Illinois in compliance with 28 U.S.C. § 1446(b).

10. Venue is proper in this judicial district because this action was originally brought in the Circuit Court of Cook County, Illinois and Sonic's principal place of business is located in this judicial district. *See* 28 U.S.C. §§ 93(a), 1441(a), 1446(a).

4

WHEREFORE, Defendant Motorola, Inc. prays that this civil action be removed from the

Circuit Court of Cook County, Illinois to the United States District Court for the Northern

District of Illinois.

**DATED: September 2, 2004**

Respectfully submitted,

MOTOROLA, INC.

By: _____
    One of Its Attorneys

Bart A. Lazar
Jennifer K. Fardy
Daniel W. Tarpey
SEYFARTH SHAW LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
(312) 346-8000 (telephone)
(312) 269-8869 (facsimile)

5

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SONIC NETWORK, INC.,                )
                                    )
              Plaintiff,            )
                                    )
vs.                                 )      No: _____
                                    )
MOTOROLA, INC.,                     )
                                    )
              Defendant.            )

### COMPLAINT AND JURY DEMAND

Plaintiff complains of Defendant as follows:

### Summary Of The Suit

1.    Plaintiff Sonic Network, Inc. and Defendant Motorola, Inc. entered into a one-year license agreement which granted to Motorola a limited license to utilize Sonic's proprietary ringtone technology in connection with the manufacture and sale of Motorola cellular telephones.  In connection therewith, Motorola agreed that, absent a new license agreement with Sonic, it would not commercially exploit Sonic's proprietary ringtone technology for a period of five years following the September 30, 2002 expiration of the license agreement.  In violation of the license agreement, Motorola is now utilizing Sonic's proprietary ringtone technology in connection with both the manufacture of Motorola cell phones, and also the manufacture

and sale of semiconductor chips to other cell phone manufacturers. Plaintiff hereby brings suit against Motorola for breach of contract and misappropriation of Plaintiff's intellectual property, and seeks actual and punitive damages, as well as injunctive relief, against Motorola.

### Parties

2. <u>Plaintiff</u>. Plaintiff Sonic Network, Inc. ("Sonic") is an Illinois corporation with its principal place of business in Flossmoor, Illinois.

3. <u>Defendant</u>. Defendant Motorola, Inc. ("Motorola") is a Delaware corporation with its principal place of business in Libertyville, Illinois.

### Facts

4. Sonic is one of the leading producers and suppliers of the technology and related software for the production of digital sounds and digital musical tones. The technology developed by Sonic allows the ringtone on a cellular telephone to generate music, rather than just a monophonic beep.

5. Motorola is one of the largest manufacturers of cellular telephones in the world. In 2000 Motorola had two divisions -- a cell phone division called the Personal

Communications Sector ("PCS"), and a semiconductor chip division called the Semiconductor Products Sector ("SPS").

6. The cell phone division, PCS, manufactured and sold fully assembled wireless communication devices, such as cell phones and cordless telephones, whereas the computer chip division, SPS, manufactured and sold computer chips to other companies involved in the production of computers and other electronic devices. Prior to the summer of 2001, Motorola had a firm and definite corporate policy that its semiconductor chip division, SPS, would not sell Motorola cell phone computer chips to competing cell phone manufacturers.

7. In early 2000 Motorola approached Sonic inquiring whether Sonic could assist Motorola in improving the ringtone capabilities of Motorola's cellular telephones. According to Motorola, it was losing a substantial portion of the multi-billion dollar cell phone market to Nokia, a competing cell phone manufacturer, because the new Nokia cell phones had incorporated recent and advanced technology for the playback of musical ringtones.

8. Thereafter, representatives of Motorola and Sonic negotiated the terms and conditions under which Sonic would license its proprietary ringtone technology related to (a)

wavetable soundsets (Sonic's digital sound libraries); (b) synthesizers (Sonic's software for the conversion of the wavetable soundsets to audible sounds); and (c) Sonic's software to coordinate the composition and playback of customized musical ringtones (collectively, the "Sonic Products"). These negotiations culminated with a technology license agreement dated December 6, 2000 (Px 1) (the "License Agreement").

9. Motorola needed a "quick boost" to help it catch up with the competition in the development of polyphonic ringtones for cell phones. Then, at the end of one year, either Motorola and Sonic could agree to extend the License Agreement with the payment of additional license and royalty fees to Sonic, or Sonic could market its proprietary ringtone technology to other cell phone manufacturers, with Motorola agreeing to not commercially exploit Sonic's proprietary ringtone technology for a period of five years.

10. Both Motorola and Sonic acknowledged and understood that the license fee for Sonic's proprietary ringtone technology was extremely low because the initial term of the License Agreement was for just one year. The short term of the License Agreement would allow Sonic an opportunity to prove itself and thereby "get its foot in the door" as far as future digital

audio agreements with Motorola. Indeed, the agreement between Sonic and Motorola was a limited and short-term license agreement, not a technology sale agreement.

11. In the License Agreement Motorola acknowledged that the Sonic Products constituted the confidential and proprietary intellectual property of Sonic (id. ¶1(c)), and that the Sonic Products "[are] and shall at all times remain the property of [Sonic]." (Id. ¶8.1(d)) Further, Motorola agreed that no use of the Sonic Products was permitted except as otherwise expressly provided in the License Agreement (id.), and that no grant of any proprietary rights to the Sonic Products was given, "including any license implied or otherwise, except for those license rights expressly granted [in the License Agreement]." (Id.)

12. The term of License Agreement was for a period of one year from the date that Motorola tested and accepted the prototype of the last Sonic Product (which was on September 30, 2001). The license fee for the one-year term of the License Agreement was $320,000, with no royalties paid to Sonic during the initial term of the License Agreement.

13. Motorola also agreed that, upon expiration of the License Agreement on September 30, 2002, it would cease using

-5-

the Sonic Products (id. ¶10.3(b)), except that Motorola could (a) "deploy" (utilize) the Sonic Products in connection with all completed cell phones that Motorola then had in its inventory (id. ¶10.3(a)), and (b) "retain copies" of the Sonic Products (but not manufacture more copies) for the purpose of "supporting" Motorola's current use of the Sonic Products and future implementation of the Sonic Products during the term of the License Agreement. (Id. ¶10.3(b))

14. Accordingly, Motorola and Sonic agreed that when the initial term of the License Agreement expired on September 30, 2002, Motorola could sell off its existing inventory of cellular telephones which contained the Sonic Products, and could retain copies of the Sonic Products for the purpose of supporting (i.e., quality control) any Motorola cell phones which had been sold under the License Agreement. Indeed, the License Agreement expressly provided that the Sonic Products constituted the confidential and proprietary intellectual property of Sonic (Px 1 ¶1(c)), and that the Sonic Products "[are] and shall at all times remain the property of [Sonic]." (Id. ¶8.1(d))

15. Further, Motorola agreed that, for a period of five years following the expiration of the License Agreement, Motorola would not commercially exploit the Sonic Products.

(<u>Id</u>. ¶8.5)   In other words, upon expiration of the License Agreement on September 30, 2002, Motorola agreed that (a) it would cease using the Sonic Products in connection with the manufacture and sale of additional cell phones and other wireless communication devices (<u>id</u>. ¶10.3(b)), and (b) it would not, absent a new license agreement, commercially exploit the Sonic Products for a period of five years.  (<u>Id</u>. ¶8.5)

16.  In addition, both Sonic and Motorola understood and agreed that Motorola's utilization of the Sonic Products was limited to internal use only in connection with Motorola's manufacture and sale of wireless communication devices such as cellular phones and cordless telephones, and that Motorola did not otherwise have the right to incorporate Sonic's proprietary ringtone technology into Motorola computer chips that Motorola could then sell to other cell phone manufacturers.   As acknowledged at the very beginning of the License Agreement:

> [T]he parties desire to set forth the terms and conditions under which Sonic would provide to Motorola certain Sonic Products for incorporation in Motorola's wireless Communication Devices . . ..

(Px 1 p. 1)

17.  Moreover, during the period of time that Sonic and Motorola negotiated the terms of the License Agreement, and at

the time of the execution of the License Agreement on December 6, 2000, Motorola had a firm and definite corporate policy -- which was understood by Sonic -- that Motorola would not sell its cell phone computer chips to other cell phone manufacturers.

18. In late September of 2001 Motorola accepted the final prototype of the Sonic Products. A short while prior to that event, Motorola publicly announced that it was changing its corporate policy about the sale of its cell phone computer chips to other cell phone manufacturers. Accordingly, Motorola would now allow its semiconductor division, SPS, to manufacture and sell cell phone computer chips to competing cell phone manufacturers.

19. On October 31, 2001 Motorola contacted Sonic about executing a new license agreement or extending the existing License Agreement to allow Motorola's semiconductor division to sell Motorola computer chips that had incorporated therein Sonic's proprietary ringtone technology to other cell phone manufacturers. Thereafter Motorola and Sonic engaged in negotiations over the terms of a new license agreement which would allow Motorola's semiconductor division -- SPS -- to sell Motorola/Sonic computer chips to other cell phone manufacturers.

20. During these negotiations, representatives of Motorola (including Motorola's attorneys) acknowledged on numerous occasions that, absent a new license agreement, Motorola did not have the right to sell any Motorola computer chips to other cell phone manufacturers if the computer chip had incorporated therein any of Sonic's proprietary ringtone technology. Indeed, on May 7, 2002 John Meldrum, a senior manager from Motorola's semiconductor division, admitted that the ringtone technology that Motorola wanted to incorporate into its computer chips was, in fact, Sonic's technology, and that Motorola needed to license that technology from Sonic.

21. The negotiations for the new license agreement progressed to the point where Motorola's legal department had prepared and forwarded to Sonic two draft license agreements. These draft license agreements would have accorded Motorola the right to manufacture and sell computer chips which contained Sonic's proprietary ringtone technology in exchange for the payment of additional license and royalty fees to Sonic. Sonic, however, required additional contract language in the new license agreement to protect the confidentiality of its proprietary ringtone technology.

22.  Unbeknownst to Sonic, Motorola had already embedded Sonic's proprietary ringtone technology on the computer chips that Motorola had contracted to sell to other cell phone manufacturers.  Indeed, at the very time that Motorola was negotiating the terms by which Motorola could license Sonic's proprietary ringtone technology, Motorola failed to disclose to Sonic that it had already entered into agreements for the sale of the Motorola/Sonic computer chips to other cell phone manufacturers.  Eventually the Motorola representatives had to admit that they could not agree to the additional intellectual property protection sought by Sonic because Motorola had already entered into binding sale agreements with other cell phone manufacturers.

23.  With no new license agreement between Sonic and Motorola, the original License Agreement expired in accordance with its terms on September 30, 2002.  One month later, Motorola abruptly ended the negotiations and informed Sonic that Motorola had reversed itself and was now taking the position that it did not need a new license agreement, but rather Motorola had a perpetual license to utilize Sonic's proprietary ringtone technology in connection with the original License Agreement. Motorola also announced that, despite the five-year exclusivity

period set forth in the License Agreement, it intended to continue to use Sonic's proprietary ringtone technology in connection with the manufacture and sale of Motorola's cellular telephones and semiconductor chips, without any further accounting obligations to Sonic.

24. Motorola has, in fact, wrongfully incorporated Sonic's proprietary ringtone technology into Motorola's cellular telephones manufactured and sold after September 30, 2002, and has wrongfully incorporated Sonic's proprietary ringtone technology in the computer chips that Motorola has sold, and continues to sell, to other cell phone manufacturers. Motorola's sale of Motorola/Sonic computer chips to other cell phone manufacturers undercut Sonic's ability to market its proprietary ringtone technology to other cell phone manufacturers.

25. In early December of 2002 Motorola again contacted Sonic about possible upgrades to the Sonic Products. Motorola, however, was not willing to discuss any pricing or license fee issues unless and until Sonic waived its rights and acknowledged that Motorola had the right, under the original License Agreement, to sell computer chips which had incorporated Sonic's proprietary ringtone technology. Sonic refused to buckle under

Motorola's pressure, reiterating that Motorola did not, in fact, have the right to incorporate Sonic's proprietary ringtone technology into any computer chips which were sold to third parties without a new license agreement with Sonic.

26. All conditions precedent to recovery by Plaintiff have been performed or have occurred.

27. Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

**Count One**
**(Breach Of Contract)**

28. Motorola has breached the License Agreement by utilizing Sonic's proprietary ringtone technology in connection with (a) Motorola's manufacture and sale of cellular telephones after September 30, 2002; and (b) Motorola's manufacture and sale of computer chips to other cell phone manufacturers. Further, as detailed above, Motorola breached its implied obligation of good faith in connection with the performance of its obligations under the License Agreement, and breached ¶23.4(a) of the License Agreement by not employing "the highest ethical standards" in connection with the licensing of Sonic's proprietary ringtone technology.

**Count Two**
**(Conversion)**

29.   The course of conduct described above constitutes the misappropriation and conversion of Plaintiff's intellectual property and trade secrets.

**Count Three**
**(Injunction)**

30.   Upon the trial of this case, Plaintiff respectfully requests that the Court enter a permanent injunction enjoining and prohibiting Motorola from (a) manufacturing and selling any additional cellular telephones and other wireless communication devices which incorporate Sonic's proprietary ringtone technology until the expiration of the five-year period of exclusivity on September 30, 2007; and (b) manufacturing and selling any additional semiconductor chips which incorporate Sonic's proprietary ringtone technology until the expiration of the five-year period of exclusivity on September 30, 2007.

**Damages**

31.   Plaintiff has suffered direct, proximate and consequential damages as a result of the conduct described above in an amount not less than $40,000,000.

32.   In addition, Motorola's actions toward Plaintiff were willful and wanton and are characterized by oppression, and

-13-

malice is the gist of the action. Accordingly, punitive damages are appropriate to deter such conduct in the future, and Plaintiff is entitled to an assessment of punitive damages against Motorola in an amount not less than three times Plaintiff's actual damages.

### PRAYER

Plaintiff respectfully requests:

(1) that the Defendant be cited to appear and answer;

(2) that Plaintiff have judgment against the Defendant for (a) Plaintiff's actual damages in an amount not less than $40,000,000; (b) punitive damages in an amount not less than three times Plaintiff's actual damages; (c) pre- and post-judgment interest at the highest lawful rate; and (d) reasonable attorneys' fees;

(3) that Plaintiff have judgment against the Defendant for the injunctive relief requested herein; and

(4) that the Court grant Plaintiff court costs and such further relief to which it may be entitled.

### JURY DEMAND

Plaintiff requests a trial by jury.

-14-

Respectfully submitted,

ARMSTRONG LAW FIRM

DATED:   June 24 2004.

By

    F. Dean Armstrong #36232
1324 Dartmouth Road
Flossmoor, IL  60422
(708) 798-1599
Fax (708) 798-1597

Attorneys for Plaintiff
Sonic Network, Inc.

-15-

**MOTOROLA
AND
SONIC NETWORK, INC.**

**MIDI-BASED AUDIO TECHNOLOGY
DEVELOPMENT AND LICENSE AGREEMENT**

THIS AGREEMENT, effective as of _December 6_, 2000 ("EFFECTIVE DATE"), is entered into by and among Motorola Inc., a Delaware corporation, by and through its Personal Communications Sector, with a place of business at 600 N. US Highway 45, Libertyville, IL 60048 ("Motorola") and Sonic Network, Inc., an Illinois Corporation, with a place of business at 2711 Second Private Road, Flossmoor, IL 60422 ("Sonic"). Motorola and Sonic may be referred to herein as a Party or the Parties as the case may require.

WHEREAS, Sonic is in the business of designing, developing, selling and licensing technology based on the Musical Instrument Digital Interface (MIDI) protocol, and has developed and owns or has licensed the rights to certain secure, MIDI compliant software and server software (hereafter, the "Sonic Products") that facilitates the transmission of MIDI program files and data between server application software and MIDI-capable wireless communication devices; and

WHEREAS, Motorola is in the business of developing, manufacturing, selling and licensing equipment and software for the deployment of enhanced services for wireless Communication Devices and systems; and

WHEREAS, the parties desire to set forth the terms and conditions under which Sonic will provide to Motorola certain Sonic Products for incorporation in Motorola wireless Communication Devices (hereafter, "Motorola Products").

NOW, THEREFORE, in consideration of their mutual promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sonic and Motorola agree as follows:

1. **DEFINITIONS**

    As used in this AGREEMENT, the following terms shall have the following meanings:

    (a)  "Affiliate(s)" means any corporation, company or other entity that is a party's Subsidiary. A company is a "Subsidiary" of a company (its "Holding Company") if that other company holds a majority of the voting rights in it, is a member of it and has the right to appoint or remove a majority of its board of directors, or is a member of it and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in it or if it is a subsidiary (as defined above) of a company which is itself a subsidiary of that other company. A Subsidiary also includes a company in which the Holding Company owns, controls, or holds less than the majority described above if the laws of the country in which such Subsidiary is located prohibit such majority ownership and mandate ownership in a minority amount, and the Holding Company's ownership of such Subsidiary is equal to the maximum ownership permitted under such country's local laws. An Associated Company shall only qualify as an Associated Company during the period when such holding or control exists. References herein to Motorola shall be deemed to include reference to its Affiliates unless otherwise specified or the context otherwise requires. For the avoidance of doubt, Motorola Affiliates shall include all operating divisions of Motorola, Inc.

    (b)  "Application Programming Interface" or "API" means a functional interface that is supplied by an operating system or by a separately licensable program that allows an application program to use specific data or functions of the operating system or licensable program.

    (c)  "Confidential Information" means confidential or proprietary data or information of either party or any of its Affiliates which is disclosed in oral, written, graphic, machine recognizable, sample or any

other form, by one party to the other party, and which is clearly designated or marked as confidential or proprietary. For simplicity of administration, all data or information provided from one party to the other is confidential or proprietary unless indicated otherwise. Confidential Information also includes Sonic Products and Documentation. Notwithstanding anything to the contrary herein, the receiving party shall have no obligation to preserve the confidentiality of any information which (i) was previously known to the receiving party free of any obligation to keep it confidential; (ii) is distributed to third parties by the disclosing party without restriction; (iii) is or becomes publicly available, by other than unauthorized disclosure by the receiving party; (iv) is independently developed by the receiving party; (v) is received rightfully and without confidential limitation by the receiving party from a third party; or (vi) is disclosed to a governmental authority lawfully demanding confidential information, provided that the disclosing party provides prior written notice to the other party and a reasonable opportunity to obtain a protective order, and that confidentiality is otherwise maintained by the parties after such disclosure.

(d) "Communication Device" means a product that includes means for transmitting or receiving radio frequency communications, including, but not limited to pagers, cellular phones, cordless telephones, 2-way radios, personal digital assistants (PDAs), PCS devices and cable modems.

(e) "Documentation" means textual and/or graphical material, perceived directly by human and/or with the aid of a device or machine, relating to the Sonic Products or Motorola Products.

(f) "End User" means any individual, company, firm or other entity that is granted a lease, license or sublicense which includes the right to use a Motorola Product for its own use, and who does not have the right to sublicense such Product to another Third Party or End User

(g) "End User Documentation" means textual and/or graphical material, perceived directly by human and/or with the aid of a device or machine, distributed by Motorola to an End User relating to the Motorola Product(s).

(h) "Error" means any verifiable and reproducible failure of the Sonic Products to perform substantially in accordance with the applicable Specifications.

(i) "Error Correction" means any and all changes to the Sonic Products that correct the adverse effect of a failure of the Audio Product(s) to perform any function.

(j) "Internal Use" means use of Sonic Products within Motorola's business or organization only by Motorola employees and not for resale or for sublicensing to End-Users.

(k) "Object Code" means any form or part of software or a program that is compiled or assembled from the Source Code, which is suitable for direct execution by a computing device and unsuitable to be read and understood by a person.

(l) "Sonic Products" means all Midi-based technology delivered by Sonic to Motorola under this Agreement, including, but not limited to, synthesizer, MCU and DSP parsing technology, wavetable soundsets and audio extensions, as more fully described in Appendix A.

(m) "Source Code" means a series of instructions or statements on any media and that are capable of being read directly by humans, and that may be compiled into object code, which instructions or statements represent of a software program, regardless of the form in which it is stored, from which it is possible to discern the logic, algorithms, internal structure, operating features and any other design characteristics of such software program.

(n) "Third Party" means dealers, independent software vendors, value added resellers, original equipment manufactures, distributors, manufacturer's representatives, and other such entities engaged in doing business with Motorola, Motorola Affiliates, and others, and who acquire the Motorola Products for

the purpose of ultimate rental, lease, sublicense, or resale to End Users, or for the purposes of reselling services to End Users.

2. SONIC PRODUCTS

2.1 <u>Sonic MIDI Based Products</u>. Sonic agrees to timely provide to Motorola the MIDI-based Sonic Products described in Appendix A (Sonic Products and Pricing). Motorola may make, use or sell the Sonic Products for use with or integration in Motorola Products, which shall include the right to (i) modify the Sonic Products; (ii) incorporate the Sonic Products into other software developed by Motorola or licensed by Motorola; and (iii) for any other use as Motorola may choose from time to time. Motorola shall have all rights to reproduce or distribute any of the Sonic Products, including but not limited to distribution of Error Corrections provided to Motorola by Sonic in accordance with Section 7.2.

2.2 <u>Sonic Deliverables</u>. Sonic agrees to provide the Sonic Products as specified in Appendix A, and according to the timetable in Appendix B. The Sonic Products delivered to Motorola shall conform to the applicable specifications as set forth in Appendix C. The Sonic Products shall be delivered to Motorola in Fixed Point C Code, in both paper format and electronic media, unless otherwise agreed between the Parties.

2.3 <u>Sonic Grants</u>. Sonic grants to Motorola a worldwide, irrevocable, exclusive (as provided in Section 2.5),, transferable, assignable, non-royalty-bearing right and license to use, copy, make, have made, modify and create derivative works, compile, sell and distribute the Sonic Products, and all software embodied therein, for use with Motorola Products or software to be used internally, to provide products and services to End Users and to reproduce, sublicense, and distribute the Sonic Products to End Users and Third Parties. The rights set forth in this Subsection 2.3 are granted provided that Motorola pays the sums set forth in Section 3 of this Agreement. Motorola shall have all rights to distribute the Sonic Products or incorporated with, or adapted for incorporation with, other software developed by Motorola or licensed by Motorola for incorporation into and development of Motorola Products.

2.4 <u>Documentation</u>. Sonic agrees to provide Motorola sufficient copies, but not less than two (2) copies of the Sonic Product Documentation as described in Appendix B and C.. Such Documentation shall include the functions, characteristics and operating procedures for the Products. Sonic further agrees that all future Documentation and revisions, updates and corrections to existing Documentation shall be furnished to Motorola at no additional charge promptly when such Documentation is available. Sonic hereby grants Motorola a worldwide, revocable, exclusive, transferable, non-assignable, royalty-free license to use, reproduce and distribute copies of the Documentation in support of Motorola's use of the Sonic Products, including the right to merge the Documentation into other documentation and material of Motorola to create End User Documentation.

2.5 <u>Exclusivity</u>. Sonic shall not use or otherwise license, sell, distribute or assign any Sonic Products accepted by Motorola to or for any other Communication Device for a period of 12 months following the date that Motorola accepts the final deliverable of the Sonic Products (Medium Wavetable 8KHz MIDI Synthesizer with DSP Parser or the last accepted Sonic Product in the event that some Sonic Products are not accepted) provided, however, that Sonic shall not be restricted from licensing, selling, distributing or assigning Sonic Products not accepted by Motorola for any other Communication Device in the event that this agreement is terminated prior to delivery of the final deliverable.

2.6 <u>Restrictions</u>. Motorola shall not, except as expressly provided herein, resell or otherwise transfer or distribute the Sonic Products or any derivative work thereof.

2.7    Reserved Rights. Motorola acknowledges, understands and agrees that notwithstanding the grant rights provided herein, Sonic shall have the right, except as expressly provided herein, to develo produce, reproduce, manufacture, distribute, transfer, perform, display, promote, advertise, sell, re and otherwise exploit the Sonic Products, including any derivative or new versions thereof.

2.8    Additional Sonic Technologies. From time to time after the execution of this Agreement, the part may agree to have additional Sonic products or technology covered by the terms of this Agreement The parties agree to address such additional matters in one or more written agreements, signed both parties and specifically referencing this Agreement.

2.9    Sonic Development Support. Sonic shall provide phone and email support during the term of Agreement, for purposes of assisting Motorola in the integration of the Sonic Products. Sonic sh assure that the synthesizer coding engineer and wavetable engineer shall continue to be availab during normal business hours of 9 am to 5 pm Eastern Standard Time, Monday through Frid without any additional charges during the term of this Agreement and for a period of 6 mon thereafter (the "Support Period"), for the purposes of assisting Motorola in creation of t Application Programmers Interfaces (APIs) for the Groovebox. After the Support Period, a additional support will be available for an hourly rate of $150 per hour. For the avoidance of dou the parties understand that Motorola shall be responsible for design and integration of the MIDI interface and integration thereof with the Motorola Product platform architecture. Telephone supp will consist of telephone consultation with a representative of Sonic to provide Motorola w information, advice and assistance concerning use and integration of the Sonic Products. Su telephone support will be provided during normal business hours of 9 am to 5 pm Eastern Standa Time, Monday through Friday. Email support will consist of email consultation with a representati of Sonic to provide Motorola with information, advice and assistance concerning use and integrati of the Sonic Products. Such email support will be provided during normal business hours of 9 am t pm Eastern Standard Time, Monday through Friday.

2.10   Modifications. Sonic will accept requests to change or edit the wavetable sound content and will use reasonable commercial efforts to comply with those mutually agreed upon requests within the confines of the applicable memory requirements. This assistance shall be made available during normal business hours during the term of this Agreement and for a period of 12 months thereafter, unless otherwise agreed in writing. Sonic shall retain all right, title and interest in and to all such modifications, and Motorola shall use such modification solely in accordance with the terms and conditions of this Agreement.

3.    FEES AND PAYMENTS

3.1.   Non-Recurring Engineering Fee. As compensation for the development and delivery of the Son Products, including the transfer to Motorola of all rights, and licenses to the Sonic Products, Motorol will pay to Sonic Nonrecurring Engineering fees (NRE") for the Sonic Products as specified Appendix A ("Products and Pricing"). Payment shall be made in accordance with the delive milestones identified in Appendix B ("Timetable for Delivery and Payment Milestones").

3.2    Taxes. Except as otherwise provided herein, all fees are exclusive of any federal, state and loc taxes, duties or excises, value added or any other sales taxes. If Sonic pays any such taxes, duties excises, Sonic shall itemize such taxes, duties or excises as a separate item on its invoices Motorola, and Motorola shall reimburse Sonic for such taxes, duties or excises; provided, th Motorola shall not be required to make any such reimbursement if it provides a valid tax exemptio certificate to Sonic prior to shipment.

4.    INDEMNIFICATION AND LIMITATION OF LIABILITY

4.1    Indemnification by Sonic. Sonic agrees to defend, indemnify, and hold harmless Motorola from a against any claim, suit, or proceeding and any damages, liability, or other expenses (including, b not limited to, reasonable attorneys' fees and court costs) which arise out of or result from: (a) gro

negligence or wrongful acts of employees of Sonic while performing Sonic's obligations hereunder and/or (b) infringement of any third party patent, copyright, trade secret, or trademark rights based on the Sonic Products; provided, however, that such indemnification shall not apply to any claims which arise out of or result from any infringement claim made by any person to the extent that such claim is based upon: (a) modifications to the Sonic Products made by Motorola, its employees, consultants and agents; or (b) any combination of the Sonic Products with products of Motorola or any third party, which combination is the basis for such claim. Sonic's obligations under this Section 4.1 are subject to the following conditions and obligations of Motorola: (a) Motorola agrees to notify Sonic in accordance with Section 12 ("Notices") upon learning of any claim, suit, action, or proceeding for which Motorola may be entitled to indemnification under this Agreement; (b) Motorola shall permit Sonic to control the defense and settlement of any such claim and if Sonic takes control of the defense, then Sonic shall not have any obligation to reimburse Motorola for any attorneys' fees incurred by Motorola thereafter; (c) Motorola agrees to provide reasonable assistance to Sonic, at Sonic's expense, in the defense of same; and (d) Motorola will not enter into any settlement agreement or otherwise settle any such claim without Sonic's express prior written consent or request.

4.2 <u>Indemnification by Motorola.</u> Motorola agrees to defend, indemnify, and hold harmless Sonic from and against any claim, suit, or proceeding and any damages, liability, or other expenses (including, but not limited to, reasonable attorneys' fees and court costs) (1) which arise out of or result from the manufacture, packaging, marketing, sale, distribution, use or performance of MotorolaProducts, including, but not limited to, actions founded on product liability, or (2) infringement of any third party patent, copyright, trade secret, or trademark rights based on (a) modifications to the Sonic Products made by Motorola, its employees, consultants and agents; or (b) any combination of the Sonic Products with products of Motorola or any third party products supplied by Motorola, which combination is the basis for such claim (collectively, the "Motorola Elements"). Motorola's obligations under this Section 4.2 are subject to the following conditions and obligations of Sonic: (a) Sonic agrees to notify Motorola in accordance with Section 12 ("Notices") upon learning of any claim, suit, action, or proceeding for which Sonic may be entitled to indemnification under this Section 4.2; (b) Sonic shall permit Motorola to control the defense and settlement of any such claim and if Motorola takes control of the defense, then Motorola shall not have any obligation to reimburse Sonic for any attorneys' fees incurred by Sonic thereafter; (c) Sonic agrees to provide reasonable assistance to Motorola, at Motorola's expense, in the defense of same; and (d) Sonic will not enter into any settlement agreement or otherwise settle any such claim without Motorola's express prior written consent or request.

4.3 <u>Remedies for Sonic's Infringement.</u> In the event that Sonic receives notification that a Sonic Product or any part thereof is the subject of a claim of patent, copyright, trademark, or trade secret infringement as described in Section 4.1, Sonic shall, at its option, either (a) modify the Sonic Product, without diminishing its functional capabilities, to make it noninfringing; or (b) use reasonable efforts to obtain a license to such rights as may be required to permit Motorola to continue using the Sonic Product under the terms of this Agreement. If neither of the foregoing alternatives is available to Sonic on a reasonable basis, or if Motorola is unable, after using its commercially reasonable efforts, to independently obtain a license as necessary to avoid such allegedly infringing activity, then Motorola shall discontinue further manufacture, marketing or distribution of such Sonic Product(s) and Sonic shall refund all money received from Motorola for such Sonic Product(s) under this Agreement.

4.4 Limitation of Liability. Except for any liability under Sections 4.1 and 4.2, under no circumstances whatsoever shall either party be liable to the other party or any other person, firm or corporation, for damages of any kind arising out of or in any relation to this Agreement, the performance thereof, the Sonic Products or services delivered pursuant to this Agreement, and/or a party's alleged breach of this Agreement. The limitations on liability set forth in this section shall apply to all causes of action, including, but not limited to, breach of contract, breach of warranties, strict liability, negligence and other torts, and liability based upon the provisions of any part of this Agreement and any federal, state, and/or local law and/or ordinance.

5. PROTECTION OF PRODUCT SOURCE CODE

    5.1    <u>Limited Access</u>. The Parties agree to safeguard their copy(ies) of the Source Code of Sonic Prod[...] and to limit access to the Source Code to only those employees who need such access in [...] performance of their jobs at Sonic or Motorola, as applicable, and to take appropriate action[...] preserve the confidentiality of the Source Code of Sonic Products and other Confidential Informat[...] Sonic agrees not to disclose, transfer, provide, or otherwise make available in any form, the So[...] Code of Sonic Products under development for or accepted by Motorola for a period of 12 mo[...] after the acceptance date of the last Motorola accepted Sonic Product.

6. TRADEMARKS

    6.1    <u>No Use of Motorola Marks</u>. Sonic shall not use any trademarks, trade names or service mark[...] Motorola, or any word or symbol likely to be confused with any Motorola trademark, trade nam[...] service mark, either alone or in any combination with another word or symbol, except with the p[...] written consent of Motorola.

7. DELIVERY AND ACCEPTANCE OF SONIC PRODUCTS

    7.1    <u>Sonic Products</u>. Sonic shall deliver the Sonic Products in accordance with the schedule set for[...] Appendix B. Sonic Products will not be deemed accepted until Motorola has tested each Delive[...] and each Product to determine whether the Deliverable conforms to its Specifications. Motorola [...] test the Deliverables and Products in accordance with the Acceptance Test Plan set forth in App[...] D.

    7.2    <u>Delivery of Error Corrections</u>. Sonic agrees to provide to Motorola one copy in both Source[...] Object Code Form of any Error Corrections within 30 days of development thereof.

8. CONFIDENTIALITY

    8.1    <u>Exchange of Confidential Information</u>. From time to time during the performance of this Agreem[...] the parties may deem it necessary to provide each other with Confidential Information, as defin[...] Section I(c) of this Agreement. The parties agree:

    (a) To maintain the confidentiality of such Confidential Information and not disclose same t[...] third party, except as authorized by the original disclosing party in writing.

    (b) To restrict disclosure of Confidential Information to employees who have a "need to kn[...] Such Confidential Information shall be handled with the same degree of care that the receiving [...] applies to its own confidential information of similar import, but in no event less than reaso[...] care.

    (c) To take precautions necessary and appropriate to guard the confidentiality of Confid[...] Information, including informing its employees who handle such Confidential Information that [...] confidential and not to be disclosed to others.

    (d) That Confidential Information is and shall at all times remain the property of the discl[...] party. No use of any Confidential Information is permitted except as otherwise expressly pro[...] herein and no grant under any proprietary rights is hereby given or intended, including any [...] implied or otherwise, except for those license rights expressly granted herein.

    (e)    To use such Confidential Information only as required in performance of this Agreemen[...]

8.2 Termination. Upon any termination of this Agreement, except as explicitly provided for in Section 10 (Term and Termination) of this Agreement, the receiving party agrees to return all Confidential Information hereunder and further agrees to, as the disclosing party directs, either destroy and certify the destruction of, or return to the disclosing party within thirty (30) days following the termination date, all complete or partial copies of Confidential Information in the receiving party's possession or control, including any copies receiving party may have produced.

8.3 Copying. The receiving party shall not make copies of Confidential Information except as authorized by the disclosing party. The receiving party shall preserve any proprietary or confidentiality legends contained on any copy of any item of Confidential Information supplied under this Agreement.

8.4 Responsibilities as to Employees. The receiving party acknowledges that Confidential Information may contain information that is proprietary and valuable to the disclosing party and that unauthorized dissemination or use of the Confidential Information may cause irreparable harm to the disclosing party. Therefore, the receiving party shall take appropriate action, by instruction, agreement or otherwise as set forth herein, with any employee permitted access to the Confidential Information so as to enable it to hold the Confidential Information in confidence or otherwise satisfy its obligations under this Agreement.

8.5 Survival. Each party's obligations under this Agreement to keep confidential and restrict use of the other party's Confidential Information shall survive the expiration or termination of this Agreement for a period of 5 years.

8.6 Independent Development. Each party acknowledges that the other party and/or third parties are, or may be developing software, products, and services similar in functionality to those developed hereunder. Each party agrees that the receipt of its Confidential Information by the other party shall in no way prohibit the other party and/or third parties from developing such software, products and services, provided that the provisions of this Section 8 regarding the ownership, protection and security of Confidential Information have not been breached.

9. DEVELOPMENT AND INTEGRATION SUPPORT

Motorola shall be solely responsible for porting and integrating the Sonic Products and software with Motorola Products and software. Sonic shall provide Motorola with reasonable assistance with respect to such porting and/or integration, including consultation on Application Programming Interfaces, integration design, user interface module design, device layer support, support for compiling and linking source code, and debugging support. Sonic shall provide Motorola with 3 training sessions on site in Libertyville as described in Appendix B. Sonic shall pay for the travel expenses associated with this travel. In the event that Motorola requires that a Sonic representative travel to a Motorola facility to provide such assistance, Motorola shall reimburse Sonic for all reasonable travel expenses incurred, without markup, and according to Motorola's travel guidelines, provided that prior written approval of Motorola has been obtained with respect to each trip. A copy of Motorola's Business Travel Policy will be furnished upon request. No travel time or first class airfares will be reimbursed by Motorola.

10. TERM AND TERMINATION

Term. Subject to termination of this Agreement under this Section ("Term and Termination"), the initial term of this Agreement (the "Initial Term") will begin on the Effective Date and will continue for the duration of the exclusivity period as defined in Section 2.5. Notwithstanding the foregoing, Motorola may terminate work on modules delivered more than 30 days after the agreed upon delivery date specified in Appendix B of this Agreement. Such a termination as to any module(s) shall have no effect on any of the rights and obligations under this Agreement regarding any other accepted module(s) and/or Sonic Product(s) and Motorola may use all accepted Sonic Products as

per the conditions of this Agreement. *[This last sentence conflicts with both Section 2.5 and the previous sentence: exclusivity period runs from date of acceptance.*

**10.2** **Termination for Cause**

(a) Insolvency Related Causes. Either party may terminate this Agreement and all the licenses granted in Section 3 ("License and Sublicense Rights") at any time upon written notice ("Termination Notice") to the other party: (a) if the other party makes an assignment for the benefit of creditors; or (b) there are instituted by or against the other party proceedings in bankruptcy, receivership or dissolution (other than for the purposes of an amalgamation, reconstruction or other reorganization and in such manner that: (i) the company resulting from such reorganization agrees to be bound by and assume the obligations imposed on that other party under this Agreement, and (ii) within thirty (30) days after the commencement of such proceedings, such other party posts or causes to be posted a bond guaranteeing the payment of all sums reasonably anticipated to be payable by it hereunder during the period of such proceedings) and such proceeding is not removed within sixty (60) days thereafter.

(b) Termination for Breach. If a party materially breaches the terms of this Agreement, the other party may, at its option, terminate this Agreement by serving written notice on the other party, which notice specifies the material breach and requires such material breach to be cured. If the material breach has not been cured within thirty (30) days of the original notice of breach or such other period as may be mutually agreed in writing by the parties, then the non-breaching party will have the right to terminate this Agreement by a further written notice ("Termination Notice") to the breaching party.

(c) Cessation of Business. The other party ceases to conduct business in the normal course, or institutes any proceedings for the liquidation or winding up of the business or for the termination of its corporate charter.

**10.3** **Rights and Obligations at Termination.** (a) Upon expiration or termination of this Agreement, Motorola retains the right to deploy all accepted Sonic Products in conformance with the terms of this contract. (b) Upon expiration or termination of this Agreement for any reason each party will promptly cease using and destroy and certify such destruction, or return to the other party, all items that contain any Confidential Information (as defined herein) of the other party, except Motorola shall be permitted to retain copies of the accepted Sonic Products and Improvements and Error Corrections together with the associated Confidential Information for the purpose of supporting its current and future implementations of Sonic Products in Motorola Products.

**10.4** **Effect of Termination.** Expiration or termination of this Agreement by either party shall not affect the accrued rights of the Parties arising in any way out of this Agreement as of the date of termination or limit either party from pursing any other remedies available to it, including injunctive relief. The parties' rights and obligation, which by their nature are intended to survive expiration or termination of this Agreement, shall so survive.

**10.5** **No Damages for Termination.** Neither party shall be liable to the other party for terminating this Agreement in accordance with this Section 10 ("Term and Termination"). Without limiting the foregoing, each party hereby waives any right it may have under applicable legislation to an indemnity, damages, or compensation on account of the termination.

**11. WARRANTIES**

Each party to this Agreement represents and warrants that it has the full right, power and authority to enter into this Agreement and to discharge its obligations hereunder. Each party further represents and warrants that

neither the execution, delivery and performance of this Agreement by such party nor the consummation by such party of the transactions contemplated hereby will conflict with, or result in a breach of, any of the terms, conditions or provisions of such party's Articles of Incorporation, Bylaws, or any agreement to which it is a party.

## 12. NOTICES

Form of Notice. All notices required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if dispatched by overnight courier, facsimile or registered or certified mail, postage prepaid, in any post office in the United States or Canada addressed as follows:

If to Motorola:

Motorola, Inc.

Personal Communications Sector

600 North U. S. Highway 45

Libertyville, Il 60048

Attn: General Manager

With a copy to:

Law Department

(same address)

If to Sonic:

Sonic Network, Inc.

Engineering Facility

66 Rear Dudley Street

Arlington, MA 02476

Attn: Jennifer Hruska

12.2    When Effective. Either Party may change its address by a notice given to the other Party in the manner set forth above. Notices given as herein provided shall be construed to have been given seven (7) days after the mailing thereof.

## 13. FORCE MAJEURE

Neither party to this Agreement will be liable for failure to perform any of its obligations hereunder during any period in which such performance is delayed by fire, flood, war, riot, embargo, organized labor stoppage, earthquake, acts of civil and military authorities, or any other acts beyond its reasonable control; provided, however, that the party suffering such delay immediately notifies the other party of the delay; and provided further, that either party shall have the right to terminate this Agreement upon thirty (30) days prior written

notice if the delay of the other party due to any of the above-mentioned causes continues for a period of (30) days.

14. **NO WAIVER**

Except as otherwise provided in this Agreement, any failure of any of the parties to comply with obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefit to only by a written instrument signed by the party granting such waiver. Such waiver or failure to insist strict compliance with such obligation, representation, warranty, covenant, agreement or condition sh operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

15. **GOVERNING LAW AND DISPUTE RESOLUTION**

15.1 <u>Governing Law.</u> This Agreement shall be governed by, construed and enforced in accordance the laws of the State of Illinois, without giving effect to principles of conflicts of laws, and shal event be governed by the United Nations Convention on Contracts for the International S Goods. Unless a claim or suit involves intellectual property rights or the threat of seriou irreparable injury to that party or to others, prior to instituting suit the parties will attempt in faith to discuss and agree upon a plan of resolution for such issue, as described below.

15.2 <u>Escalation.</u> The parties will attempt to settle any dispute, claim or controversy arising out Agreement through consultation and negotiation in good faith and in a spirit of mutual cooper If those attempts fail, then the dispute will be mediated by a mutually-acceptable mediator chosen by the parties within 45 days after written notice by either Party demanding med Neither party may unreasonably withhold its consent to the selection of a mediator, and the will share the costs of the mediation (or other ADR) equally. Each party shall pay its own att fees and other costs. The mediator shall be knowledgeable about technology licensing and app law. By mutual agreement, however, the parties may postpone mediation until each has con some specified but limited discovery about the dispute. The parties may also agree to mediation with some other form of ADR, such as neutral fact-finding or a minitrial.

15.3 <u>Alternate Dispute Resolution (ADR).</u> Any dispute which the parties cannot resolve between through negotiation, mediation or some other form of non-binding ADR within 45 days of the the initial demand for it by one of the Parties may be submitted for final resolution to a co competent jurisdiction, as specified in 16.1, above. The use of any ADR procedure will construed under the doctrines of laches, waiver or estoppel to affect adversely the rights of party. Nothing in this section will prevent either party from resorting to judicial proceedings i faith efforts to resolve the dispute under these procedures have been unsuccessful.

16. **INDEPENDENT CONTRACTORS**

Nothing contained herein or done in pursuance of this Agreement shall constitute the parties entering joint venture or partnership, or shall constitute either party the agent for the other for any purpose or sense whatsoever. Neither party shall, for any purpose, be deemed to be an agent of the other party, relationship between the parties shall only be that of independent contractors. Neither party shall ha right or authority to assume or create any obligations or to make any representations or warranties on be any other party, whether express or implied, or to bind the other party in any respect whatsoever. Un circumstances shall any personnel of either Party be considered to be an employee or agent of the other P

17. **PUBLIC DISCLOSURE**

All notices to third parties and all other publicity, including press releases, public announcement advertisements or marketing, or promotional materials, concerning the terms and conditions with regard Agreement shall be jointly planned and coordinated by and between the Parties. Neither of the Parties sh unilaterally in this regard without the prior written approval of the other Party. Neither Party may di either the existence or the terms and conditions of this Agreement or the details of the relationship betwe Parties without the other Party's prior consent. The parties may issue a joint press release regarding Agreement, the content, timing and positioning of which has been mutually agreed upon by both parties to issuance.

18.     **CAPTIONS**

The captions used in this Agreement are for convenience of reference only and are not to be us interpreting the obligations of the Parties under this Agreement.

19.     **ADVICE OF COUNSEL**

Each party acknowledges and represents that, in executing this Agreement, it has had the opportunity t advice as to its legal rights from legal counsel and that the person signing on its behalf has rea understood all of the terms and provisions of this Agreement. This Agreement shall not be construed a any party by reason of the drafting or preparation thereof.

20.     **SUCCESSORS AND ASSIGNS**

This Agreement and the rights and obligations arising hereunder shall be binding upon and inure to the b of the parties and to their respective successors and assigns. Neither party may assign this Agreement w the prior written consent of the other party, which consent shall not be unreasonably withheld; provided such consent shall not be required in the event of any assignment of this Agreement to an acquirer (incl without limitation such an assignment as a result of a merger) or to the purchaser in the case of a sale o substantially all of the business or assets of the assigning party. Any unauthorized assignment shall be n void and constitute a breach of this Agreement. In the event that either party is acquired (by reason of m sale of assets, or otherwise) by an entity that offers products or services substantially similar to the produ services of the other party, the other party may terminate this Agreement by serving written notice assigning party.

21.     **SEVERABILITY AND SURVIVABILITY**

21.1    <u>Severability.</u> In the event any one or more of the provisions of this Agreement is held unenforceable or invalid under applicable law: (i) such unenforceability or invalidity shall not any other provision of this Agreement; (ii) this Agreement shall be construed as i unenforceable or invalid provision had not been contained herein; and (iii) the parties shall neg in good faith to replace the unenforceable or invalid provision by such as has the effect nearest of the provision being replaced.

21.2    <u>Survivability.</u> The parties agree that where the context of any provision indicates an intent shall survive the term of this Agreement, then it shall survive.

22.     **AUTHORITY**

Each party hereto represents and warrants that (i) it has obtained all necessary approvals, consent authorizations of third parties and governmental authorities, if applicable, to enter into this Agreement perform and carry out its obligations under this Agreement, (ii) the persons executing this Agreement behalf have express authority to do so, and, in so doing, to bind the party thereto; (iii) the execution, de and performance of this Agreement does not violate any provision of any bylaw, charter, regulation, other governing authority of the party; and (iv) the execution, delivery and performance of this Agreeme

-12-

been duly authorized by all necessary partnership or corporate action and this Agreement is a valid and binding obligation of such party, enforceable in accordance with its terms.

23.    MISCELLANEOUS

23.1    Amendment.  This Agreement may be amended or supplemented only by a writing that refers specifically to this Agreement and is signed by duly authorized representatives of both parties.

23.2    Export.  Motorola acknowledges and agrees that the Motorola Products may be subject to certain U.S. export control licensing restrictions, including U.S. Commerce Department controls on encrypted technology.  THIS AGREEMENT IS EXPRESSLY MADE SUBJECT TO ANY LAWS, REGULATIONS, ORDERS OR OTHER RESTRICTIONS ON THE EXPORT FROM THE U.S. OF ANY SOFTWARE OR PRODUCT THAT INCLUDES OR INCORPORATES ANY ENCRYPTION TECHNOLOGY, INCLUDING THE MOTOROLA PRODUCTS.  Motorola agrees to comply at all times with all applicable United States laws and regulations relating to the exportation of the Motorola Products and with all applicable foreign import laws and regulations relating to the Motorola Products and this Agreement, and shall not export or re-export the Motorola Products from the U.S., except in strict compliance with U.S. export control laws, including, as applicable, obtaining appropriate licensing authority from the U.S. Commerce Department prior to any export or re-export of the Motorola Products.  Motorola agrees that its obligations pursuant to this Section 19.5 ("Export") shall survive and continue after any termination or expiration of rights under this Agreement.

23.3    Counterparts.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.  Any copy of this agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

23.4    Practices.

(a)  Ethics.  Each party has historically depended upon product quality and superiority, combined with outstanding support capability to sell its products.  Accordingly, each party agrees to license the Licensed Products hereunder and provide services related thereto with the highest ethical standards.  A party will not do business with any entity or person where such party believes that payoffs or similar improper or unethical practices are involved.  If a party fails to comply in any respect with this requirement, then the other may terminate this Agreement pursuant to Section 17.3.

(b)  Equal Opportunity.  Each party hereby acknowledges and agrees that as a supplier to the other, it will comply with its obligations to be an equal opportunity employer and not to discriminate against any employee or applicant for employment on the basis of sex, race, religion, color, age, marital status, national origin, handicap condition, or veteran/disabled veteran status.  Each party agrees to comply with any and all applicable state and local government equal opportunity and affirmative action laws, including any and all applicable statutes, rules, regulations, ordinances, and other guidelines.  This Agreement specifically incorporates and makes a part hereof, all the provisions of Title VII of the Civil Rights Act of 1964; Executive Orders 11246 and 11701; Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974; Section 503 of the Rehabilitation Act of 1973; and the California and Illinois Human Rights Acts (or their equivalent).  Each party agrees to comply with all of its obligations required under said statutes, regulations and executive orders, to file all compliance reports required and, on request, to provide the other with any information necessary for a party to comply with its own responsibilities under said statutes and regulations.

(c)  Certification of Nonsegregated Facilities.  Each party certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments in the United States, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  Each party agrees that breach of this certification is a violation of the equal opportunity obligations incorporated herein.  Each party

further agrees that when using subcontractors in the United States to provide licenses and services the other under this Agreement it will either: (i) obtain certifications of nonsegregated facilities fi proposed subcontractors for specific time periods, or (ii) obtain certifications of nonsegrega facilities from proposed subcontractors before the award of any subcontracts subject to the Eq Opportunity clause, retain such certifications in its files, and forward the Notice set forth FAR 52.222-21 to proposed subcontractors.

24.    **ENTIRE AGREEMENT**

This Agreement and Exhibits hereto constitute the entire understanding between the parties concerning subject matter hereof and supersedes all prior discussions, agreements and representations, whether oral written and whether or not executed by Motorola and Sonic. In case of inconsistencies between the term this Agreement and the Exhibits, this Agreement shall govern and supersede the Exhibits. Purchase or issued pursuant to this Agreement shall be deemed to be governed by the terms of this Agreement, and in c of inconsistencies between the terms of this Agreement and any purchase orders, this Agreement s supersede, whether or not this Agreement is specifically incorporated by reference into such purchase ord This Agreement or any part or provision hereof shall not be deemed waived, amended, or modified by ei party unless such waiver, amendment or modification is in writing and executed by authorized representat of both parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the last signature date heret

MOTOROLA, INC.                                SONIC NETWORKS, INC.

_____                    _____
Signature                                    Signature

Ralph Pini                                   Jennifer Hruska
_____                    _____
Printed Name                                 Printed Name

Title: VP TPRB                               Title: President

Date December 14, 2000                       Date December 6, 2000

## Appendix A
### Sonic Products and Pricing

1. Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser without Mfi support      $150,000.00
2. Audio Extensions      $90,000.00
3. Small_Wavetable_8KHz MIDI Synthesizer with DSP Parser      $20,000.00
4. Medium_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser      $20,000.00
5. Medium_Wavetable_8KHz MIDI Synthesizer with DSP Parser      $20,000.00
6. Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser with MFi support      $20,000.00

Appendix B
Timetable for Delivery and Payment Milestones

B.1 Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser without MFi support

Delivery Dates
- 12/11/2000 – Rev. 1 Wavetable set for evaluation & design documents (Code design document, detail description document for Wavetable Set)
- 12/18/2000 – Completed Engine and Wavetable Set and completed documents
- Earlier than 12/31/2000 – 2 days workshop in Motorola Inc, for Completed MIDI Engine and Wavetable Set

Payment Milestones
- 50% due upon signing of contract
- 50% due upon completion and acceptance of the Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser without MFI support project deliverables

B.2 Audio Extensions

Delivery Dates
- 02/05/2001– Rev. 1 Code & design documents (Code design document, detail description document for all audio extensions)
- 02/12/2001– Completed Code and completed documents
- Earlier than 02/19/2001 2 days workshop in Motorola Inc, for Completed audio extension Code

Payment Milestones
- 50% due upon start of the audio extensions project deliverables.
- 50% due upon completion and acceptance of the audio extensions project deliverables

B.3 Small_Wavetable_8KHz MIDI Synthesizer with DSP Parser

Delivery Dates
- 01/18/2001– Rev. 1 Engine Code, Wavetable Set for evaluation & design documents (Code design document, detail description document for Wavetable Set)
- 02/05/2001– Completed Engine and Wavetable Set and completed documents
- Earlier than 02/19/2001– 1 day workshop in Motorola Inc, for Completed MIDI Engine and Wavetable Set

Payment Milestones
- 50% due upon start of the Small_Wavetable_8KHz_MIDI Synthesizer with DSP Parser sound engine project
- 50% due upon completion and acceptance of the Small_Wavetable_8KHz MIDI Synthesizer with DSP Parser project deliverables

B.4 Medium_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser

Delivery Dates
- 01/29/2001 – Rev. 1 Engine Code, Wavetable Set for evaluation & design documents (High & low level design document, detail description document for Wavetable Set)
- 02/05/2001 – Completed Engine and Wavetable Set and completed documents
- Earlier than 02/19/2001– 1 day workshop in Motorola Inc, for Completed MIDI Engine and Wavetable Set

Payment Milestones
- 50% due upon start of the Medium_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser sound engine project.
- 50% due upon completion and acceptance of the Medium_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser sound engine Project deliverables

**B.5 Medium_Wavetable_8KHz MIDI Synthesizer with DSP Parser**

### Delivery Dates

- 03/19/2001 – Rev. 1 Engine Code, Wavetable Set for evaluation & design documents (High & low l design document, detail description document for Wavetable Set)
- 03/26/2001 – Completed Engine and Wavetable Set and completed documents

### Payment Milestones

- 50% due upon start of the Medium_Wavetable_8KHz MIDI Synthesizer with DSP Parser sound engi project.
- 50% due upon completion and acceptance of the Medium_Wavetable_8KHz MIDI Synthesizer with I Parser project deliverables

**B.6 Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser with MFi support**

### Delivery Dates

- 02/19/2001 – Rev. 1 Wavetable set for evaluation & design documents (Code design document, deta description document for Wavetable Set)
- 02/26/2001 Completed Engine and Wavetable Set and completed documents
- Earlier than 03/02/2001 – 1 days workshop for Completed MIDI Engine and Wavetable Set

### Payment Milestones

- 50% due upon start of the Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser with MFi sound engine project.
- 50% due upon completion and acceptance of the Small_Wavetable_22.05KHz_MIDI Synthesizer with Parser with MFi support project deliverables

## Appendix C

### Sonic Product Functional and Technical Specifications

**C.1 Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser without MFi support**

*Deliverables:*
- Small Wavetable 22.05KHz Synthesizer (16-bit Data fixed point C-code)
- Wavetable Set (data file) that fully compliant GM Level 1 requirement
- DSP MIDI Parser (16-bit Data fixed point C-code)
- The test files and detail test document. The test files need cover all features and requirements list on this Specification.
- Specification design for DSP Parsers
- Detailed Code Design Document
- Detailed Wavetable Contents Document including instrument and note wavetable addresses

*Small Wavetable 22.05KHz MIDI Synthesizer [TM]:*
- General MIDI Level 1 that fully compliant with The Complete MIDI 1.0 Detailed Specification document, published in 1997 by The MIDI Manufacturers Association
- 128 Melodic Instruments & 47 Percussion sounds that are fully GM compliant.
- 16 MIDI Channel Playback
- 16-voice Polyphonic
- Stereo playback (128 sample block or 5ms note start updates)
- 22050Hz sampling rate with linear interpolator
- Per Channel LFO for Vibrato or Tremolo
- Per Voice ADSR Amplitude Envelope
- 2-pole Resonant Low Pass Filter
- Per Voice ADSR Modulation Envelope for Filter or Pitch
- Wave, Region and Instrument Control Data Parameters
- Multi-Media and Graphic Synchronization Support

*GM Wavetable Set 1:*
- 128 Melodic Instruments & 47 Percussion sounds that are fully GM and MFI compliant
- 22.05 kHz maximum sampling rate
- 45k bytes wavetable ROM

*Memory Allocation: (16-bit processor)*
- DSP Data ROM: 45k bytes
- DSP Data RAM: 20k bytes
- DSP Program Memory (Synth and parser): 9K words
- DSP Mips allocation: 35 MIPS

**C.2 Audio Extensions**

*Deliverables:*
- 16 channels General MIDI playback for background game soundtracks
- Virtual channels for Sound Effects playback
- Messaging system between MCU and DSP for Game Audio interface
- MCU API for Game Audio interface
- .wav, .aif, .au, .wsf (wavetable synthesizer format) file support
- Custom DLS file converter
- The MIDI extension Parser that will support MIDI file and MIDI extension file (include .wsf, .wav, .aif, .au

MP3, and PNG/GIF/JPEG/BMP format.
- The detail document about Audio extension file (include MIDI, .wsf, .wav, .aif, .au, MP3, and PNG/GIF/JPEG/BMP format
- GrooveBox Synthesizer with API (fixed point C-code)
- Data Compression on phone
- API and Data Type Documentation for audio extensions
- The test files and detailed test document. The test files need to cover all the features and requirements listed on this Specification

The audio extensions will be compatible with Medium_Wavetable_8KHz MIDI Synthesizer, Small_Wavetable_22.05KHz Synthesizer and Medium_Wavetable_22.05KHz Synthesizer.

## Custom DLS File Converter & Synthesizer:
- Converter will run on a server and convert a standard DLS1 file plus DLS2 LPF and Env 2 articulation data into the WSF (wavetable synthesizer format) used on the mobile device for playback
- A sampled sound source with loop, 1 layer, tuning, volume and pitch articulation
- Two 4-segment envelope generators characterized as ADSR (Attack- Decay-Sustain-Release)
- One Low Frequency Oscillator (LFO) generators
- A low Pass Filter (LPF) with resonance and dynamic filter cutoff frequency
- LFO modulation control of LPF
- LPF cutoff and Q respond to continuous controller information
- Standardized response to MIDI control

## Custom DLS Synthesizer Memory Allocation:
- Program Memory: 1k words
- DSP Data RAM: 10K Bytes
(This memory is addition for supporting game sound or custom DLS file)

## Game Sound engine:
- 16 channels General MIDI playback for background game soundtracks
- Virtual channels for Sound Effects playback
- Messaging system between MCU and DSP for Game Audio interface
- MCU API for Game Audio interface
- MIDI background music
- Sampled (PCM) audio for game actions
- 8 simultaneous sounds mixed (7 PCM + 1 MIDI)
- Priority levels for game actions, background music
- Low latency startup for a game action sound (TBD ms)
- MIDI performance degradation should use lower polyphony rather then discarding tracks

## Game Sound engine Memory Allocation:
- Program Memory: 1k words
- DSP Data RAM: 10K Bytes
(This memory is addition for supporting game sound or custom DLS file)

## GrooveBox ™ Synthesizer Functionality:
- Downloadable groove sequence capability
- Start, Stop, Pause and Tempo control
- Real-time interaction with music elements
- 8 musical parts can play simultaneously
- Per part beat location and pitch control
- User musical input into groove sequence

- Save and replay capability

*Sonic Network Responsibility for GrooveBox:*
> The software module implementing the "GrooveBox" synthesizer functionality together with all the application programming interfaces (APIs) needed to control the GrooveBox™ Synthesizer module.

*Motorola Responsibility for GrooveBox:*
> User Interface and Integration.

*GrooveBox Memory Allocation:* (16-bit processor)
- MCU Program Memory: 4k words
- DSP Program Memory: 2k words
- DSP Data RAM: 256 words

## C.3 Small_Wavetable_8KHz MIDI Synthesizer with DSP Parser

*Deliverables:*
- Small Wavetable 8KHz MIDI Synthesizer (16-bit Data fixed point C-code)
- GM Wavetable Set (data file)
- DSP MIDI Parser (16-bit Data fixed point C-code)
- The test files and detail test document. The test files need cover all features and requirements list on this Specification
- Specification design for DSP Parser
- Detailed Code Design Documentation
- Detailed Wavetable Contents Document

*Small Wavetable 8KHz MIDI Synthesizer™:*
- General MIDI Level 1 that fully compliant with The Complete MIDI 1.0 Detailed Specification document, published in 1997 by The MIDI Manufacturers Association
- 128 GM Melodic Instruments & 47 Percussion sounds
- 8 MIDI Channel Playback
- 8-voice Polyphonic
- Monophonic playback (128 sample block or 5ms note start updates)
- 8kHz sampling rate with linear interpolator
- Global LFO for Vibrato or Tremolo
- Per Voice ADSR Amplitude Envelope
- Wave, Region and Instrument Control Data Parameters
- Multi-Media and Graphic Synchronization Support

*GM Wavetable Set 2:*
- 128 GM Melodic Instruments & 47 Percussion sound
- 8kHz maximum sampling rate
- 20k bytes wavetable ROM

*Memory Allocation: (16-bit processor)*
- DSP Data ROM: 20k bytes
- DSP Data RAM: 15k bytes
- DSP Program Memory: 7K words
- DSP Mips allocation: 20 MIPS maximum

## C.4 Medium_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser

*Deliverables:*

- Medium Wavetable 22.05KHz MIDI Synthesizer (32-bit Data fixed point C-code)
- GM Wavetable Set (data file)
- DSP MIDI Parser (32-bit Data fixed point C-code)
- The test files and detail test document. The test files need cover all features and requirements list on this Specification
- Specification design for DSP Parsers
- Detailed Code Design Documentation
- Detailed Wavetable Contents Document

### Medium Wavetable 22.05KHz MIDI Synthesizer ™:

- General MIDI Level 1 that fully compliant with The Complete MIDI 1.0 Detailed Specification document, published in 1997 by The MIDI Manufacturers Association
- 128 GM Melodic Instruments & 47 Percussion sounds
- 16 MIDI Channel Playback
- 24-voice Polyphonic
- Stereo playback (128 sample block or 5ms note start updates)
- 22050Hz sampling rate with linear interpolator
- Per Channel LFO for Vibrato or Tremolo
- Per Voice ADSR Amplitude Envelope
- 2-pole Resonant Low Pass Filter
- Per Voice ADSR Modulation Envelope for Filter or Pitch
- Wave, Region and Instrument Control Data Parameters
- Custom DLS file support.
- Multi-Media and Graphic Synchronization Support

### GM Wavetable Set 1:

- 128 GM Melodic Instruments & 47 Percussion sounds
- 22050Hz maximum sampling rate.
- 70k bytes wavetable ROM

### Memory Allocation: (32-bit processor)

- DSP Data ROM: 70k bytes
- DSP Data RAM: 24k bytes + 10K bytes
- DSP Program Memory (for Synth and DSP parser): 9K words + 1K word
- DSP Mips allocation: 45 MIPS maximum

### C.5 Medium_Wavetable_8KHz MIDI Synthesizer with DSP Parser

### Deliverables:

- Medium Wavetable 8KHz MIDI Synthesizer (16-bit Data fixed point C-code)
- GM Wavetable Set (data file)
- DSP MIDI Parser (16-bit Data fixed point C-code)
- The test files and detail test document. The test files need cover all features and requirements list on this Specification
- Specification design for DSP Parser
- Detailed Code Design Documentation
- Detailed Wavetable Contents Document

### Medium Wavetable 8KHz MIDI Synthesizer ™:

- General MIDI Level 1 that fully compliant with The Complete MIDI 1.0 Detailed Specification document, published in 1997 by The MIDI Manufacturers Association

- 128 GM Melodic Instruments & 47 Percussion sounds
- 16 MIDI Channel Playback
- 16-voice Polyphonic
- Stereo playback (128 sample block or 5ms note start updates)
- 8kHz sampling rate with linear interpolator
- Per Channel LFO for Vibrato or Tremolo
- Per Voice ADSR Amplitude Envelope
- Wave, Region and Instrument Control Data Parameters
- Multi-Media Synchronization Support

*GM Wavetable Set 4:*
- 128 GM Melodic Instruments & 47 Percussion sound
- 8kHz maximum sampling rate
- 30k bytes wavetable ROM

*Memory Allocation: (16-bit processor)*
- DSP Data ROM: 30k bytes
- DSP Data RAM: 20k bytes
- DSP Program Memory: 9K words
- DSP Mips allocation: 25 MIPS maximum

## C.6 Small_Wavetable_22.05KHz_MIDI Synthesizer with DSP Parser with MFi support

*Deliverables:*
- Small Wavetable 22.05KHz Synthesizer with MFi 2.0 file format support (16-bit Data fixed point C-code)
- Wavetable Set (data file) that fully compliant with MFi 2.0 and GM Level I requirement
- MFi 2.0 to SMF file format converter
- DSP MIDI Parser (16-bit Data fixed point C-code)
- The test files and detail test document. The test files need cover all features and requirements list on this Specification.
- Specification design for DSP Parsers
- Detailed Code Design Document
- Detailed Wavetable Contents Document including instrument and note wavetable addresses

*Small Wavetable 22.05KHz MIDI MFi Synthesizer ™:*
- General MIDI Level 1 that fully compliant with The Complete MIDI 1.0 Detailed Specification document, published in 1997 by The MIDI Manufacturers Association
- MFi2.0 that fully compliant with i-Melody Service Requirements version 2.0 April 17, 2000,
- MFi 2.0 to SMF file format converter
- 128 Melodic Instruments & 47 Percussion sounds that are fully GM and MFi compliant.
- 32 MFi Sound Effect Set
- 16 MIDI Channel Playback
- 16-voice Polyphonic
- Stereo playback (128 sample block or 5ms note start updates)
- 22050Hz sampling rate with linear interpolator
- Per Channel LFO for Vibrato or Tremolo
- Per Voice ADSR Amplitude Envelope
- 2-pole Resonant Low Pass Filter
- Per Voice ADSR Modulation Envelope for Filter or Pitch
- Wave, Region and Instrument Control Data Parameters
- Custom DLS file support

Motorola Confidential Proprietary

- Multi-Media and Graphic Synchronization Support

### GM Wavetable Set 6:

- 128 Melodic Instruments & 47 Percussion sounds that are fully GM and MFi compli
- 32 MFi Sound Effect Set
- 22.05 kHz maximum sampling rate
- 45k bytes GM wavetable ROM
- 5K Bytes MFi sound effect set

### Memory Allocation: (16-bit processor)

- DSP Data ROM: 50 k bytes
- DSP Data RAM: 20k bytes
- DSP Program Memory (for Converter, Synth and parser): 9K words
- DSP Mips allocation: 35 MIPS

## Appendix D

### Acceptance Test Plan

(a) After receipt of each of the Sonic Products, Motorola will examine and test the Sonic Products to ensure that they substantially conform to the applicable Product Specifications and Documentation. Within thirty (30) days after receipt of a Sonic Product, Motorola will (1) indicate its acceptance of such Sonic Product by providing written notice of acceptance; or (2) provide Sonic with written notice stating in reasonable detail the non-conformities that cause the Sonic Product to not substantially conform to the Product Specifications or Documentation. If Motorola fails to provide Sonic with written notice under (a)(1) or (a)(2), above, within thirty (30) days of receipt a Sonic Product then Motorola shall be deemed to have accepted such Sonic Product.

(b) If Sonic has received written notice of non-conformity, then within thirty (30) days after receipt of such written notice, Sonic will use reasonable efforts to cure such non-conformities and resubmit the Sonic Product to Motorola. Motorola shall again examine and test the Sonic Product to determine whether it now substantially conforms to the Product Specifications and Documentation. Within thirty (30) days after receipt of the resubmission, Motorola will (1) indicate its acceptance of the resubmitted Sonic Product by providing written notice of acceptance; or (2) provide Sonic with written notice stating in reasonable detail the non-conformities that cause the Sonic Product to not substantially conform to the Product Specifications or Documentation. If Motorola fails to provide Sonic with written notice under (b)(1) or (b)(2) within thirty (30) days of receipt a Sonic Product then Motorola shall be deemed to have accepted such Sonic Product.

(c) If not accepted, Sonic will again have thirty (30) days from receipt of notice to cure the non-conformities and resubmit the Sonic Product to Motorola. If this second attempt to cure the non-conformities results in another failure, Motorola may, at its sole option, terminate this Agreement by providing prompt written notice to Sonic, said termination being effective upon receipt of such notice, with no additional time to cure. No payments shall be due to Sonic for any Sonic Product that is not accepted under this Acceptance Test Plan.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she caused to be served upon the following a true and correct copy of the Foregoing **Notice of Filing and Notice of Removal,** on this 2nd day of September, 2004, via first-class mail, postage prepaid, deposited at 55 East Monroe Street, Chicago, Illinois, before the hour of 5:00 p.m.:

F. Dean Armstrong, Esq.
1324 Dartmouth Road
Flossmoor, Illinois 60422

Jennifer K. Fardy

CH1 10782627.1

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Sonic Network, Inc.

*FILED FOR DOCKETING*
*ED-7*

**DEFENDANTS**
Motorola, Inc.

**DOCKETED**

**SEP 3 2004**

**(b)** County of Residence of First Listed Plaintiff Cook
(EXCEPT IN U.S. PLAINTIFF CASES)

*CLERK*
*U.S. DISTRICT COURT*

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
F. Dean Armstrong, Esq.
1324 Dartmouth Road
Flossmoor, Illinois 60422
708-798-1599

**04C 5771**

Attorneys (If Known)
Bart A. Lazar, Jennifer K. Fardy, Daniel W. Tarpey
Seyfarth Shaw LLP
55 East Monroe Street, Suite 4200
Chicago, Illinois 60603
312-346-8000

**JUDGE CASTILLO**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

**MAGISTRATE JUDGE**
**GERALDINE SOAT BROWN**

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product / Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & / Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Injury Product | ☐ 650 Airline Regs. | ☒ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability / Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability / **PERSONAL PROPERTY** | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | | | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | / Product Liability | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of |
| | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | & Disclosure Act | | ☐ 900 Appeal of Fee Determination |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | Under Equal Access to |
| ☐ 220 Foreclosure | ☐ 442 Employment / Sentence | | **FEDERAL TAX SUITS** | Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ / Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | | or Defendant) | State Statutes |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other | Security Act | ☐ 871 IRS—Third Party | |
| | / ☐ 550 Civil Rights | | 26 USC 7609 | |
| | / ☐ 555 Prison Condition | | | |

(PLACE AN "X" IN ONE BOX ONLY)

## V. ORIGIN

☐ 1 Original
Proceeding

☒ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

Transferred
another district
☐ 5 (specify)

☐ 6 Multidistrict
Litigation

Appeal to
District
☐ 7 Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Pursuant to 28 U.S.C. Sections 1338(a) and 1331, Defendant removes this action which alleges (1) breach of contract, (2) misappropriation of intellectual property, and (3) request for injunction.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____

DOCKET NUMBER _____

DATE
September 2, 2004

SIGNATURE OF ATTORNEY OF RECORD
*Jennifer K. Fardy*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

*American LegalNet, Inc.* | *www.USCourtForms.com*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the Matter of

Sonic Network, Inc.

v.

Motorola, Inc.

FILED FOR DOCKETING

04 SEP -2 PM 1:39

CLERK
U.S. DISTRICT COURT

Case Number: **04C 5771**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR: **DOCKETED**

Motorola, Inc.

SEP 3 2004

JUDGE CASTILLO

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

| (A) | | | |
|---|---|---|---|
| SIGNATURE | | | |
| NAME Jennifer K. Fardy | | | |
| FIRM Seyfarth Shaw LLP | | | |
| STREET ADDRESS 55 East Monroe Street, Suite 4200 | | | |
| CITY/STATE/ZIP Chicago, Illinois 60603 | | | |
| TELEPHONE NUMBER 312-346-8000 | FAX NUMBER 312-269-8869 | | |
| E-MAIL ADDRESS jfardy@seyfarth.com | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6229562 | | | |
| MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☒ | NO ☐ | |

| (B) | | | |
|---|---|---|---|
| SIGNATURE | | | |
| NAME | | | |
| FIRM | | | |
| STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |

| (C) | | | |
|---|---|---|---|
| SIGNATURE | | | |
| NAME | | | |
| FIRM | | | |
| STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |

| (D) | | | |
|---|---|---|---|
| SIGNATURE | | | |
| NAME | | | |
| FIRM | | | |
| STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |